IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RONALD J. UCCARDI, ) <br> ) <br> ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ) <br> LAZER SPOT, INC., ) <br> ) <br> Defendant. | Case No. 18-CV-2424 <br><br> Judge Robert W. Gettleman |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ronald Uccardi filed a three count complaint against his former employer defendant Lazer Spot, Inc, in the Circuit Court of Cook County, Illinois, alleging violations of the Family Medical Leave Act, 29 U.S.C. § 2601 et. seq. (Count I), Promissory Estoppel (Count II) and Retaliatory Discharge (Count III). After defendant removed the case to this court, plaintiff dropped Count III. Defendant has now moved for summary judgment on the remaining counts. In addition, defendant has moved to strike plaintiff's response to defendant's L.R. 56.1 Statement of Undisputed Facts and plaintiff's L.R. 56.1 Statement of Additional Undisputed Facts. For the reasons explained below, defendant's motions to strike are granted in part, and the motion for summary judgment is granted.

## BACKGROUND

Defendant provides services to the trucking and warehousing industries, including: spotting (docking trucks and/or guiding them into loading docks); freight yard management; short range shuttle service; and gate personnel staffing. Plaintiff began working for defendant as a freight yard spotter in March 2015 at the Chicago Kilbourn Avenue Facility. Mike Huddleston

was a Site Manager and the Area Manager at the facility. Adam Chase was an assistant manager and was plaintiff's manager at the facility during the time in question. Mary Goldaneh was also an assistant manager and plaintiff's manager.

Defendant requires its employees to abide by the policies contained within its Employee Handbook. Plaintiff received a handbook when he was hired, and acknowledged that he read it. Section 6.5 of the handbook provides an explanation of defendant's FMLA Policy, including the requirement that the employee promptly provide the requested documentation and return to work as scheduled. The handbook specifically provides that, "[a]ny employee who fails to return to work as scheduled after FMLA leave may be subject to dismissal from employment." In addition, the handbook provides that, "if you do not report for work and the Company is not notified of your status, it will be assumed after two consecutive days of absence that you have resigned, and you will be removed from the payroll …."

Plaintiff's last day of work for defendant was February 29, 2016. On that day he apparently told Chase and/or Huddleston that he had blood in his urine "like before." Plaintiff had had a prostate issue and surgery in 2015. He asked Chase or Huddleston if he could work less hours until he could get checked out. On March 1, 2016, plaintiff went to see Dr. Pirie, a chiropractor for whom his daughter worked. Dr. Pirie testified that he would not treat plaintiff because he wasn't a medical doctor and plaintiff's problem was outside of his practice. He told plaintiff to see a specialist, but did give plaintiff a note indicating that he had seen plaintiff and that plaintiff should be excused from work until further notice. It is unclear when plaintiff provided this note to defendant.

On March 11 plaintiff went to see Dr. Jayesinghe at Presence Health. Dr. Jayesinghe is not a urologist. Dr. Jayesinghe prescribed Flomax, told plaintiff he needed to see a urologist, and

2

provided a note indicating that plaintiff should be off work until March 23. Neither Dr. Jayesinghe's note nor Dr. Pirie's note provided any information about plaintiff's condition. Each simply indicated that the doctor had seen plaintiff and plaintiff should be excused from work.

Although not entirely clear from the materials provided to the court, it appears that Goldaneh sent the two notes to Allison Pipkin of defendant's Human Resources Department ("HR") on March 15. From the documents presented it appears that Goldaneh took pictures of the notes and then sent those pictures to Pipkin, or plaintiff took pictures and sent them to Golaneh who forwarded them on. Later that day Ashley Lopez, an HR representative, sent an email to Goldaneh, Chase, and Huddleston asking if March 11 was plaintiff's first day off. Because he had been out three days, HR would need to put him on leave. She stated that plaintiff qualified for FMLA and that his job was federally protected pending approval of leave. She indicated that should would send plaintiff the FMLA documents that day, which he would then need to have his medical provider complete and return within 15 days of receipt. She also indicated that before plaintiff could return to work, HR must be notified. He would need to provide a work release "without restrictions" and provide an updated medical card.

At 12:03 a.m. March 16, Chase emailed Lopez indicating:

> We have encountered a issue with Ron. First off, his last day he worked was on 2/29/16, his first day off was 3/l/16. Ron works most of his shift with me, from 4pm to 4am. He first had told myself and Mike that he was having some issues like he had last year when he had some kind of surgery with his prostate I believe. He told us he was having blood in his urine. He had asked me if it was ok if he can work less hours till he can have it checked out. To me that raised a red flag because if I had blood in my urine I would be at the doctor that same day and not ask if I can work less hours for a couple weeks till I can get it checked out. Also the first doctor note he gave us is from a chiropractor, which I am pretty sure a chiropractor does not have anything to do with blood in urine. Also we had found out that Ron's daughter works at this chiropractor office and leaves us to believe that she had typed up this note for him. Also he gave us a second doctor note which is from a completely

3

different doctor. Both doctor notes are attached to this email. Another thing brought to our attention is that Ron's son had bought a truck and has been doing loads for Unilever here. One day he was suppose to be here at 4pm and contacted me saying he was going to be late and would be here around 8pm, in the meantime he was spotted by our shuttle drivers at 6pm dropping off a trailer at the drop yard while driving his sons truck. Another incident was a spotter had just told me yesterday that Ron was on the clock, a couple weeks ago, but had left and worked with his son in his sons truck and then later came back and finished the night here and clocked out. Since Ron has not been here the last 2 weeks all of this is just coming to our attention. It is our belief that Ron was not ill, at least not the first week he was off when he provided us with a doctors note from where his daughter works, and is instead driving with his son. To me this makes sense as to why he was asking me to work less hours with us, so he could also work with his son. All while this is screwing with our schedule here as it is making us short a spotter and making us have to shuffle our drivers around while Ron is not here working somewhere else. Any help with this situation is greatly appreciated. Thank you.

At 7:37 that morning, Lorraine Sosa, defendant's Senior HR Manager wrote back, trying to confirm that Chase thought that plaintiff was deceiving everyone, that he was not sick and did not need to be out, but instead had been working with his son. She wanted to know if Chase had statements from the drivers who saw plaintiff driving for his son, and whether plaintiff's request for less hours had been granted. She also wanted to know if HR had been notified on March1 of the note. Chase responded that "I don't want to say 100% he is not sick, but I do believe the other drivers saying they seen [sic] him driving his son's truck." Chase did not have statements from the drivers and doubted they would give statements. He indicated that the first note was given to Goldaneh and he would have to check to determine if she had sent it to HR. Sosa responded that if plaintiff had submitted a doctor's note placing him out and he qualified for FMLA, that is the route they would take. She also indicated that going forward no one should be accommodating schedules for medical reasons without looping in HR first. "The initial note is

4

dated 3/1 and coincides with request to work less hours HR should have been looped in from that time on."

Plaintiff went back to see Dr. Jayesinghe on March 23rd. He reported that he had no blood in his urine. Dr. Jayesinghe apparently gave him a note to stay off work until March 28, but there is no evidence that defendant ever received this note. As a result, on March 28 Huddleston wrote to Chase indicating that plaintiff's last doctor's note stated that he was out until March 23 and he would have to be reevaluated. He asked if this was "no call on show?" Chase responded to Huddleston copying in Sosa, Pipkin, Lopez, Goldaneh and others, that he too had not heard anything from plaintiff and that "this is the third day he has not showed after his note stated he should return. If he does not show by tomorrow can we put in a resignation for him?"

Sosa responded to to everyone stating:

Before we can call it a no show no call, let's remember he is protected under FMLA and there are steps that need to be taken before acting upon a termination.
        1. Please advise if he contact a manager or not
        2. Please advise if he shows up
                a. lf he does show up you cannot have him work till we receive notification that he can return to work without restrictions and he has provided the FMLA docs
                b. As far as I know he has not provided the FMIA documents that was sent and is required in order to qualify him for FMLA - Ashley will follow up with Ron tomorrow
                c. lf he fails to provide the necessary documents or fails to stay in touch with the employer, whether he calls you or HR we can then determine how to best address the issue at hand.
lf you have questions, please feel free to contact me.

That same day, plaintiff went back to Presence Health and saw Dr. Osmani, who was filling in while Dr. Jayesinghe was on vacation. Dr. Osmani is not a urologist. Plaintiff reported seeing blood again, and Dr. Osmani wrote a note indicating that plaintiff should be off work until he sees a urologist on April 1. The note stated that plaintiff could return to work on April 4, 2016.

The following day, March 29, 2016, at 2:13 p.m. Lopez received the Osmani note by fax. She wrote to Sosa a few minutes later indicating that she had twice tried to call plaintiff but she could not leave a voice mail. A few minutes after that she sent an email to plaintiff indicating that she had a work excuse doctor's note for plaintiff, but that she needed the FMLA documents completed by the doctor and returned to her before she could approve leave. Sixteen minutes later, Sosa emailed everyone indicating that "At this point Mr. Uccardi has proven to be non-cooperative with our requests. Ashley has sent him an email requesting a response. If he reports to work on Friday 4/1, please follow up with Ashley or me. Do not permit him to work till we get clarification that he is able to work as CMV driver per FMCSR regs. If he does not show up, let me know."

Plaintiff never responded to Lopez's email, and did not report for work on April 1. At that point defendant treated him as having resigned pursuant to its no call no show policy. Plaintiff claims that he tried to return to work on April 4, but that he was turned away because he did not have releases without restrictions from all of his doctors. He claims that Chase told him this over the phone, but there is no other evidence to support his claim. Chase was never asked in his deposition if such a conversation occurred. In any event, plaintiff did not contact anyone at defendant until two weeks later when he returned with a release from Dr. Pirie. At that point his position with the company had been terminated.

## **DISCUSSION**

Defendant has moved for summary judgment on both counts of the complaint. Summary judgment is appropriate when is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(s); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). A moving party can prevail

6

on summary judgment by either pointing to undisputed facts supported by the record that demonstrate that it is entitled to judgment, or it can point to an absence of evidence of an essential element of the responding party's claim or affirmative defense. Id. Once a moving party has met its burden, the nonmovant must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(c); Becker v. Tenenbaum-Hill Associates, Inc., 914 F.2d 107, 110 (1990). The court does not weigh conflicting evidence or make credibility determinations, but considers the evidence as a whole and draws all inferences in the light most favorable to the nonmoving party. Green v. Carlson, 826 F.2d 647, 651 (7th Cir. 1987).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (186). The nonmoving party, must, however, do more than simply "show there is some metaphysical doubt about the material facts." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient, there must be some evidence on which the jury could reasonably find for the [nonmoving] party." Anderson, 477 U.S. at 252; see Modrowski v. Pigatto, 712 F.3d 1166, 1167 (7th Cir. 2003) (The court must enter summary judgment against a party that "does not come forward with evidence that would reasonably permit the finder of fact to find in its favor on a material question.").

In support of its motion, defendant filed a statement of undisputed facts, as required by this court's local rules (L.R. 56.1(a)(1)(3)). Under the rule, each numbered paragraph is to contain a single "undisputed fact." Defendant's statement was compliant with the rule. In response to defendant's motion plaintiff filed the required L.R. 56.1(b)(3) statement, which the

rule requires to be "a concise response to the movant's statement," that includes numbered paragraphs corresponding to and summarizing the paragraph to which it is directed, containing a response to the movant's paragraphs including, in the case of any disagreement, specific references to affidavits, parts of the record, and supporting materials relied upon.

Defendant has moved to strike plaintiff's response as non-compliant. Defendant is correct that plaintiff's response fails to comply with either the letter or spirit of the rule. It is certainly not concise, comprising over 32 pages, most of which is improper argument or reference to other facts, neither of which is appropriate under the rule. There is no need to strike the response, however, because it admits all of defendant's statements. The problem with the response is that after admitting a fact to be uncontested, plaintiff then attempts to condition that admission by adding additional "facts" or argument. Rather than strike the document, the court has simply ignored everything after the word "admit" in each of plaintiff's responses.

Plaintiff also filed a statement of additional uncontested facts as allowed by L.R. 56.1(b)(3)(c). That statement is to be limited to 40 such facts. Defendant has moved to strike this statement also, first because it is overly long, and second because the statements are either not "facts" or are not supported by the citations to the record provided. Defendant is correct that the statement is overly long (it contains 44 separate "facts"), and most of the separate paragraphs contain more than one fact. The result of plaintiff's failures is to enhance the court's burden rather than ease it. " It is not the court's job to sift through mounds of paper to ferret out the material facts at issue. Nonetheless, the court did endeavor to take on the burdensome task to review the actual records submitted by the parties (as opposed to lawyer-drafted statements and briefs) to determine if summary judgment [is] appropriate on any of the issues in the case." Strychalski v. Baxter Healthcare Corp., 2014 WL 1154030, at *2 (N.D. Ill. Mar. 20, 2014). It is.

Count I accuses defendant of interfering with plaintiff's FMLA rights. The FMLA entitles an employee to twelve weeks of leave every twelve-month period if he is afflicted with a serious health condition that renders him unable to perform his job. Smith v. Hope School, 560 F. 3d 694, 699 (7th Cir, 2009). The FMLA also forbids employers from retaliating against employees for claiming benefits under the act. Id.

To prevail on his FMLA interference claim, plaintiff must demonstrate that defendant denied him leave. He does not need to show discriminatory intent. Id. He must show that: 1) he was eligible for FMLA; 2) defendant was covered by the FMLA; 3) he was entitled to FMLA leave; 4) he provided sufficient notice of his intent to take leave; and 5) defendant denied him benefits to which he was entitled. Id. Defendant argues that plaintiff cannot establish the third, fourth or fifth element. The court agrees.

To be entitled to FMLA leave plaintiff must show that he was suffering from a "serious health condition." 29 U.S.C. § 2612(a)(1)(D). An employee with a "serious health condition" is someone who has "an illness, injury, impairment, or physical or mental condition that involves - (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Continuing treatment by a health care provider includes conditions that require examinations and evaluations over a period of time. Hope School, 560 F.3d at 699. The employer may require the employee to document his condition before granting FMLA leave, and can require the employee to submit certification of his condition from the health care provider. Id. FMLA leave may be denied if the employee fails to timely supply the requested certification.

In the instant case, there is no evidence that plaintiff actually suffered from a "serious heath condition." Certainly blood in the urine can signify a serious problem. But plaintiff never

9

saw a urologist to diagnose his alleged condition. Indeed, there is no evidence that he ever tried to see a urologist. Plaintiff repeatedly tries to blame his failure on defendant for not providing "employer-based health insurance," but whether he had insurance through his employer, through the Affordable Care Act, or not at all is irrelevant to his requirement to show that he had a serious health condition. Nor did plaintiff ever submit any certification of his condition from any doctor. He claims that he never received the documents from defendant, but the evidence shows that they were mailed to his home and he admits being told that they were coming. He never inquired about them. And the doctors' notes that he did submit make no mention of his condition. Consequently, plaintiff has no evidence that he had a serious health condition, and even if he did, he failed to provide notice of his intent to take leave. He has failed to establish that he was entitled to leave, that he provided proper notice of his intent to take leave, or that defendant denied him leave to which he was entitled.

Nor is there any evidence that defendant retaliated against plaintiff for attempting to exercise his rights under the FMLA. Unlike his interference claim, plaintiff's FMLA retaliation claim requires him to prove discriminatory intent. Burnett v. LFW, Inc., 472 F. 3d 471, 477 (7th Cir. 2006). But, the evidence shows just the opposite-- that defendant intended to treat plaintiff's absence as FMLA-required leave, if only plaintiff had provided the necessary and required information. He did not. Over the entire period of time that he was off work, he failed to provide any evidence that he would need to be hospitalized or that he needed ongoing treatment. His doctors' notes simply requested that he be excused from work. He failed to keep in touch with his managers to let them know of his condition. He simply remained incommunicado until he supplied another note. Nor is there any evidence that a similarly situated employee was treated more favorably than was he. In short, nothing in the record suggests that defendant ended

his employment because he took or attempted to take FMLA leave. Defendant's motion is granted as to Count I.

Count II asserts a claim for promissory estoppel. To establish this claim he must prove that: 1) defendant made him an unambiguous promise; 2) he relied on that promise; 3) his reliance was expected and foreseeable by defendant; and 4) he relied to his detriment. Ross v. May Co.,377 Ill. App. 3d. 387, 392-94 (1st. Dist. 2007). His evidence to support this claim is woefully deficient. He testified that he had a telephone conversation with Lopez at some unspecified time in which she said he would be "alright" if he supplied doctor's notes. But he also testified that Lopez told him that she was sending him papers to be filled out by his doctors. He claims he never received those papers, but he knew they were needed. His complaint alleges that the HR Rep told him his leave would be covered under FMLA, but he testified that FMLA leave was never mentioned. Lopez has provided an affidavit in which she denies ever telling anyone that, and plaintiff never asked her about the conversation in her deposition. The alleged promise is too vague to be relied on.

In any event, plaintiff's alleged reliance did not cause him any detriment. Even assuming he was told all he needed were doctor's notes, his last note excused him until April 4. He claims he tried to return on that date but was told he needed full releases. Even assuming that to be true, he did not return again until April 18, two weeks later. His employment was not terminated because all he did was to provide doctors notes; he simply did not return to work when he was scheduled. Consequently, defendant's motion for summary judgment on Count II is granted.

**CONCLUSION**

For the reasons described above, defendant's motions to strike [Doc. 131, 132] are granted in part. Defendant's motion for summary judgment [Doc. 112] is granted.

**ENTER: July 3, 2020**

_____
**Robert W. Gettleman
United States District Judge**